## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>MUNICH REINSURANCE AMERICA, INC. F/K/A AMERICAN RE-INSURANCE COMPANY, FEDERAL INSURANCE COMPANY, TRAVELERS INDEMNITY COMPANY, INSURANCE COMPANY OF NORTH AMERICA, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, TRAVELERS CASUALTY AND SURETY COMPANY F/K/A AETNA CASUALTY AND SURETY COMPANY, GREAT AMERICAN INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, AGCS MARINE INSURANCE COMPANY F/K/A INTERSTATE REINSURANCE CORPORATION, LIBERTY MUTUAL INSURANCE COMPANY, GENERAL REINSURANCE CORPORATION F/K/A NORTH STAR REINSURANCE CORPORATION, AMERISURE MUTUAL INSURANCE COMPANY F/K/A MICHIGAN MUTUAL LIABILITY COMPANY, PEERLESS INSURANCE COMPANY, U.S. FIRE INSURANCE COMPANY, TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY F/K/A AETNA INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU F/K/A EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, AND INDEMNITY INSURANCE COMPANY OF NORTH AMERICA F/K/A STUYVESANT INSURANCE COMPANY,<br><br>Defendants. | Index No.:   3:25-cv-466 (BKS/ML)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff International Business Machines Corporation ("IBM" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against the above-captioned insurance company Defendants (collectively, "Defendant Insurers" or "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      In this insurance coverage action, IBM seeks to recover the proceeds to which it is entitled under dozens of historical commercial general liability (CGL) insurance policies. Beginning in the 1980s, IBM has been subject to dozens of governmental and/or regulatory directives requiring it to: (a) remediate alleged contamination on and/or adjacent to plant sites where hazardous substances were allegedly used; and (b) remediate alleged contamination on and/or adjacent to third-party disposal sites where hazardous substances were allegedly disposed (collectively, the "Remediation Claims").  IBM has incurred in excess of ***$900 million*** remediating the alleged property damage at issue in the Remediation Claims, and will incur substantial additional costs in the future.

2.      In late 2024, the Village of Endicott, New York, where IBM owned and operated a manufacturing facility, filed a lawsuit against IBM alleging that hazardous substances from IBM's facility have contaminated the Village's groundwater supply (collectively with pre-suit demands discussed *infra*, the "Endicott Claim").  While IBM vigorously disputes the allegations in the Endicott Claim, IBM has incurred, and will continue to incur, defense costs associated with the alleged property damage at issue, and, by this action, seeks to establish its entitlement to coverage for these costs in the event of any future judgment or settlement therein.

3.      Fortunately, IBM purchased decades worth of insurance coverage for exactly these types of property damage claims.  Since at least 1961, IBM has maintained annual CGL towers of at least tens or hundreds of millions of dollars in limits covering property damage claims and suits against IBM, such as the Remediation Claims and the Endicott Claim.  In this lawsuit, IBM seeks

several judicial declarations of its and Defendants' rights and obligations in connection with the Remediation Claims and the Endicott Claim under certain CGL policies issued between 1961 and 1970 (the "Relevant Timeframe").

4.      Policies sold to IBM during the Relevant Timeframe (the "61-70 Policies") are favorable to IBM for a number of reasons. All 61-70 Policies *do not contain pollution exclusions*. Each year within the Relevant Timeframe includes 61-70 Policies with "non-cumulation" provisions, permitting IBM to recover under any annual period of coverage *without regard for the status of other policy years* that may also be triggered by these Claims. Finally, unlike many policyholders' historical CGL coverage, the applicable limits of liability in the Relevant Timeframe remain *largely unimpaired by prior claims payments*.

5.      For all of those reasons, Defendants' obligation to pay in connection with the Remediation Claims and Endicott Claim (collectively, the "Environmental Claims") should be uncontroversial. However, in response to IBM's timely notice of the Endicott Claim and subsequent requests for coverage for all Environmental Claims accompanied by voluminous documentation, neither Defendant Munich Reinsurance America, Inc. f/k/a American Re-Insurance Company ("American Re") nor Defendant Federal Insurance Company ("Federal") has acknowledged its coverage obligations.

6.      IBM's continuing losses impact not just American Re and Federal, the first two Defendant Insurers whose policies are triggered by the Environmental Claims, but also all of the other excess Defendant Insurers who sold 61-70 Policies also triggered by the magnitude of the Environmental Claims. These Defendants, too, received timely notice of the Endicott Claim and IBM's request for coverage for the Environmental Claims, yet have not accepted coverage.

7. Accordingly, IBM brings this action against Defendant Insurers to obtain necessary judicial declarations of the parties' rights and obligations with respect to insurance coverage for the Environmental Claims under the 61-70 Policies.

## THE PARTIES

8. Plaintiff IBM is a corporation organized and existing under the laws of New York, with its principal place of business at 1 New Orchard Road, Armonk, NY 10504.

9. Upon information and belief, based on IBM's review of publicly available documentation, Defendant Munich Reinsurance America, Inc. f/k/a American Re-Insurance Company is a company organized and existing under the laws of Delaware, with its principal place of business in New Jersey.

10. Upon information and belief, based on IBM's review of publicly available documentation, Defendant Federal Insurance Company is a company organized and existing under the laws of Indiana, with its principal place of business in New Jersey.

11. Upon information and belief, based on IBM's review of publicly available documentation, Defendant Travelers Indemnity Company is a company organized and existing under the laws of Connecticut, with its principal place of business in Connecticut.

12. Upon information and belief, based on IBM's review of publicly available documentation, Defendant Insurance Company of North America is a company organized and existing under the laws of Pennsylvania, with its principal place of business in Pennsylvania.

13. Upon information and belief, based on IBM's review of publicly available documentation, Defendant St. Paul Fire and Marine Insurance Company is a company organized and existing under the laws of Connecticut, with its principal place of business in Connecticut.

4

14.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant Fireman's Fund Insurance Company is a company organized and existing under the laws of Illinois, with its principal place of business in Illinois.

15.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company is a company organized and existing under the laws of Connecticut, with its principal place of business in Connecticut.

16.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant Great American Insurance Company is a company organized and existing under the laws of Ohio, with its principal place of business in Ohio.

17.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant North River Insurance Company is a company organized and existing under the laws of New Jersey, with its principal place of business in New Jersey.

18.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant AGCS Marine Insurance Company f/k/a Interstate Reinsurance Corporation is a company organized and existing under the laws of Illinois, with its principal place of business in Illinois.

19.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant Liberty Mutual Insurance Company is a company organized and existing under the laws of Massachusetts, with its principal place of business in Massachusetts.

20.     Upon information and belief, based on IBM's review of publicly available documentation, Defendant General Reinsurance Corporation f/k/a North Star Reinsurance

Corporation is a company organized and existing under the laws of Delaware, with its principal place of business in Connecticut.

21.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant Amerisure Mutual Insurance Company f/k/a Michigan Mutual Liability Company is a company organized and existing under the laws of Michigan, with its principal place of business in Michigan.

22.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant Peerless Insurance Company is a company organized and existing under the laws of New Hampshire, with its principal place of business in Massachusetts.

23.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant U.S. Fire Insurance Company is a company organized and existing under the laws of Delaware, with its principal place of business in New Jersey.

24.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant Travelers Property Casualty Insurance Company f/k/a Aetna Insurance Company is a company organized and existing under the laws of Connecticut, with its principal place of business in Connecticut.

25.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant Employers Insurance Company of Wausau f/k/a Employers Mutual Liability Insurance Company of Wisconsin is a company organized and existing under the laws of Wisconsin, with its principal place of business in Massachusetts.

26.    Upon information and belief, based on IBM's review of publicly available documentation, Defendant Indemnity Insurance Company of North America f/k/a Stuyvesant

Insurance Company is a company organized and existing under the laws of Pennsylvania, with its principal place of business in Pennsylvania.

## JURISDICTION & VENUE

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

28.    This Court has personal jurisdiction over Defendants because each Defendant regularly transacts business in this District through the sale of insurance policies to policyholders domiciled within this District.

29.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### I.    IBM'S HISTORICAL OPERATIONS AND ENVIRONMENTAL REMEDIATION ACTIVITIES

#### A.    *IBM's Historical Operations*

30.    Founded in 1911 as the Computer-Tabulating-Recording Company, and renamed IBM in 1924, IBM has been a leading technology company for more than 100 years.

31.    Throughout its history, IBM has been at the forefront of the development of groundbreaking technology including mainframe computing, personal computing, cloud computing, artificial intelligence, and quantum computing.

32.    Like many other companies with manufacturing operations in the early and mid-1900s, IBM used chemical solvents and other chemical substances in its operations.

33.    Chemicals used by IBM allegedly entered the ground and, in some cases, allegedly entered the groundwater at or adjacent to IBM's sites.

34.    In other instances, IBM allegedly transported chemical substances to landfills for disposal, after which substances allegedly migrated to and caused damage to surrounding property.

**B.    *IBM's Site Remediation Expenses***

35.    In the 1970s and 1980s, federal and state authorities enacted numerous statutes and regulations governing the generation, storage, discharge, transportation, disposal, and cleanup of various substances believed to cause damage to the environment, including but not limited to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA").

36.    Under CERCLA, the U.S. Environmental Protection Agency ("EPA") is authorized to designate contaminated sites for cleanup and require remediation of those sites.  Such sites are often referred to as "Superfund" sites.

37.    Numerous states in which IBM has historically operated enacted statutes analogous to CERCLA.

38.    Under RCRA, the EPA regulates the treatment, storage, and disposal of solid and hazardous wastes through, among other things, issuing permits that govern the actions of site owners and operators.

39.    RCRA authorizes states to have their own RCRA programs as long as such programs are the same or more stringent than the federal program.  States in which IBM historically operated have delegated RCRA programs.

40.    Beginning in the 1980s and continuing thereafter, the EPA and state regulators, pursuant to RCRA permits and/or orders, has required IBM to remediate sites, including both IBM's own facilities and sites such as landfills where IBM disposed of allegedly hazardous substances.

41.    These governmental requirements and orders have required IBM to incur expenses at over 20 former or current IBM sites (the "IBM Sites"), all of which are located within the coverage territory of the applicable 61-70 Policies.  The majority of the IBM Sites are located in the United States, but certain are international.

42.    While each IBM Site presents its own fact pattern, the federal and/or state directives address IBM's alleged discharge of hazardous substances that purportedly caused damage to, or threatened to cause damage to, IBM's property and adjacent third-party property.

43.    The alleged discharges underpinning the federal and/or state permit requirements or orders are alleged to have occurred for years, and often decades, including during the Relevant Timeframe, prior to the passage of CERCLA, RCRA, and other environmental statutes and regulations.

44.    At all times prior to the passage of CERCLA, RCRA, and other environmental statutes and regulations, IBM's manufacturing operations were in compliance with then-applicable law.

45.    IBM has also received orders from governmental authorities requiring it to incur expenses at approximately 80 Superfund sites (the "Superfund Sites" and, collectively with the IBM Sites, the "Environmental Sites").

46.    Prior to the passage of CERCLA, RCRA, and other environmental statutes and regulations, IBM's disposal practices were in compliance with then-applicable law.

47.    Throughout the pendency of the Remediation Claims, IBM has been caused to incur hundreds of millions of dollars in mandatory site remediation expenses (the "Remediation Expenses").

48.    Remediation Expenses include, without limitation, the cost of conducting site-specific remedial investigations (researching and cataloging the alleged contamination) and feasibility studies (assessing potential cleanup strategies) at the direction of the applicable regulator(s) ("RI/FS").

49.    RI/FS can last, and for many IBM Sites have lasted, months or years, forcing the regulated entity to incur millions of dollars in expenses in the investigation of alleged contamination onsite and on adjacent third-party property.

50.    Once the RI/FS (or other analogous tasks depending on the statute(s) at issue) is complete, the applicable regulator(s) issues a Record of Decision ("ROD"), which details the cleanup measures and remedy(ies) for the site.  The cleanup design and plan is finalized and sets forth the actions that IBM, as a potentially responsible party ("PRP"), must take to halt the spread of contamination, and remediate existing contamination, both at the site itself and any affected third-party property.

51.    The implementation of the ROD can, and for many IBM Environmental Sites did, take years or even decades, forcing IBM to incur millions of dollars in expenses.

52.    The investigation and remediation of alleged contamination gave rise to other types of Remediation Expenses as well, including attorneys' fees for IBM's defense against regulators' allegations.

53.    Across all Environmental Sites, IBM's Remediation Expenses to date total in excess of $900 million and continue to grow because remediation at the majority of the Environmental Sites remains ongoing.

54.    At present, IBM estimates that future Remediation Expenses will total in excess of $300 million, bringing IBM's total Remediation Expenses at issue in this lawsuit to more than $1.2 billion.

55.    Among the dozens of Remediation Claims are the former IBM Site in Endicott, New York ($180 million in Remediation Expenses and growing) ("Endicott Plant Remediation Claim"), and a Superfund Site near the Village of Endicott ("Endicott Landfill Remediation Claim").[1]  The Remediation Claims further include numerous other Environmental Sites where IBM has already incurred in excess of $20 million in Remediation Expenses.

56.    IBM timely noticed the Remediation Claims as they were made to Defendants, beginning in or around the early 1980s, and successfully resolved coverage respecting the claims with certain non-party historical CGL insurers from the Relevant Timeframe.  In this lawsuit, IBM seeks to establish coverage for these Remediation Claims from Defendant Insurers that sold IBM policies in the Relevant Timeframe.

### C.    *Village of Endicott Allegations and Lawsuit*

57.    On October 19, 2023, counsel for the Village of Endicott, New York sent a letter to IBM referencing potential claims based on alleged contamination of the Village's groundwater supply from a substance known as 1,4-Dioxane (1,4-D), allegedly used at the Endicott Plant.

58.    On December 3, 2024, the Village commenced an action captioned *The Village of Endicott v. International Business Machines Corporation*, Case No. 1:24-cv-09242, in the United States District Court for the Southern District of New York.

59.    The Endicott Claim alleges, among other things, that: (a) IBM purchased, transported, used, processed, mixed, stored, handled, spilled, disposed and/or released hazardous

---

[1] The Endicott Claim, Endicott Plant Remediation Claim, and Endicott Landfill Remediation Claims are collectively referred to herein as the "Endicott Environmental Claims."

substances, including 1,4-D and various compounds collectively referred to as PFAS at the former Endicott Plant; (b) IBM used and subsequently disposed of these substances as components of industrial solvents and degreasers used to clean metal parts; and (c) the use and disposal of these substances at Environmental Sites, including the Endicott Plant site and the Endicott Landfill site, caused groundwater contamination.

60.    The causes of action alleged by the Village of Endicott in the Endicott Claim include: (I) Cost Recovery Pursuant to CERCLA § 107(a); (II) Declaratory Judgment Pursuant to CERCLA §§ 9607(A)(4)(B) and 9613(G)(2); (III) Public Nuisance; (IV) Negligence; (V) Failure to Warn; and (VII) Trespass.

61.    The Endicott Claim specifically alleges that IBM used and/or disposed of industrial solvents containing hazardous substances "[f]or much of its history in the Village of Endicott," a history that the Village alleges extends back to the early 1920s.

62.    The Endicott Claim seeks damages, interest, and reasonable attorneys' fees.

63.    Although IBM disputes liability and any purported damages, which would require evidentiary support and expert evaluation, the Village has alleged damages in an amount sufficient to trigger the 61-70 Policies under which coverage is sought herein.

64.    IBM is actively defending against the Endicott Claim, plans to assert numerous deficiencies in the Village's claims, and disputes all liability contended therein.  IBM has already incurred significant defense costs in connection with the Endicott Claim, which costs are continuing.

65.    Costs incurred in connection with the (disputed) Endicott Claim are in addition to the sums IBM has already separately incurred in connection with the Endicott Plant Remediation Claim and Endicott Landfill Remediation Claim.

## II.    IBM'S LEGACY COMMERCIAL GENERAL LIABILITY INSURANCE PROGRAM

66.    The Environmental Claims trigger coverage under the 61-70 Policies, including the Available Policies, as defined below.

67.    The 61-70 Policies can be divided into three groups: (1) policies under which IBM does not seek coverage because they are fully exhausted and/or subject to prior settlement agreements ("Settled Policies"); (2) policies under which IBM does not seek coverage because the issuing insurance companies are insolvent or in liquidation ("Insolvent Policies"); and (3) policies that are not settled and were issued by solvent insurance companies ("Available Policies").

68.    Appendix A hereto, which remains subject to modification as IBM obtains additional information from Insurers or other sources about historical policies, sets forth the limits, policy periods, and policy numbers for the 61-70 Policies for which such information is presently available.  Through color coding, Appendix A differentiates Settled Policies, Insolvent Policies, and Available Policies.

### A.    Settled Policies

69.    As described further below, IBM settled with numerous insurers prior to commencement of this litigation.  While IBM does not seek coverage under the Settled Policies, they remain relevant because many of the Available Policies incorporate by reference terms or conditions from one or more Settled Policies.  The key Settled Policies occupy the first five layers of IBM's insurance program during the Relevant Timeframe, as summarized in the table below:

| Insurer | Policy Periods in Relevant Timeframe | Policy Layer | Limit |
|---|---|---|---|
| Zurich | 12/31/60-12/31/70 | Primary | $100K per occurrence ("P/O") and in the aggregate ("Agg.") |
| Continental Casualty | 11/01/61-11/05/70 | 1st Umbrella | $2M P/O and Agg. xs Primary |
| American Home | 07/01/63-07/01/70 | 2nd Umbrella | $8M P/O and Agg. xs $2.1M |
| Continental Casualty | 07/01/61-07/01/70 | 3rd Excess | $2M P/O and Agg. xs $10.1M |
| General Reinsurance | 06/29/61-07/01/70 | 4th Excess | $5M P/O xs $12.1M |

### i.    The Primary Settled Policies

70.    Throughout the Relevant Timeframe, IBM purchased primary CGL insurance from non-party Zurich Insurance Company ("Zurich"). Each of the primary Settled Policies issued by Zurich (the "Primary Settled Policies") had a one-year policy period and provided an aggregate limit of $100,000 for claims involving alleged property damage arising from IBM's premises or operations.

71.    The Primary Settled Policies all contain materially similar policy terms but are subject to slight differences in policy language across the Relevant Timeframe. Filed herewith as **Exhibit A** is an exemplar Primary Settled Policy from the Relevant Timeframe, the terms of which are incorporated by reference herein.

72.    Each Primary Settled Policy runs from December 31 to December 31, beginning at least as early as December 31, 1960. Coverage under the Primary Settled Policy at Ex. A "applies only to [occurrences] which occur during the policy period within the policy territory," including "the United States of America." *See, e.g.*, Ex. A at § IV.

14

73.    The relevant insuring agreement of the Primary Settled Policy at Ex. A provides that Zurich will:

> pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . injury to or destruction of property . . . caused by an [occurrence].

*Id.* at § I.

74.    The Primary Settled Policy at Ex. A defines "occurrence" as "an event which unexpectedly causes injury during the policy period or a continuous or repeated exposure to conditions which unexpectedly causes injury to persons or tangible property during the policy period . . ." *Id.* at End. 1.

75.    The Primary Settled Policies provide that claims for property damage arising from IBM's premises or operations are subject to an aggregate limit of $100,000. *Id.* at Conditions § 7.

76.    All Primary Settled Policies have been released for purposes of claims like the Environmental Claims.

77.    Notwithstanding IBM's settlement with Zurich, IBM has incurred Remediation Expenses that would be sufficient to exhaust the limits of all Primary Settled Policies from the Relevant Timeframe.

**ii.    The First-Layer Umbrella Settled Policies**

78.    Directly excess to the Primary Settled Policies during the Relevant Timeframe, IBM purchased $2 million of umbrella liability coverage from non-party Continental Casualty Company ("Continental").

79.    Unlike the one-year Primary Settled Policies, each of the first-layer umbrella Settled Policies issued by Continental (the "First-Layer Umbrella Settled Policies") has a three-year policy period, thus the Relevant Timeframe includes only three First-Layer Umbrella Settled Policies.

80.    The First-Layer Umbrella Settled Policies covering the policy periods November 1, 1964 to November 1, 1967 and November 1, 1967 to November 1, 1970 contain materially identical policy terms as relevant here, as set forth below.  Filed herewith as **Exhibit B** is an exemplar First-Layer Umbrella Settled Policy from the Relevant Timeframe, the terms of which are incorporated by reference herein.

81.    Upon information and belief, the First-Layer Umbrella Settled Policy covering the policy period November 1, 1961 to November 1, 1964 contains substantively similar policy terms as the First-Layer Umbrella Settled Policies for the later two policy periods.

82.    The First-Layer Umbrella Settled Policies apply "to occurrences happening during the policy period anywhere in the world."  *Id.* at Insuring Agreements § 3.

83.    The relevant insuring agreement of the First-Layer Umbrella Settled Policies requires Continental "[t]o indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability, (a) imposed upon the Insured by law, … for damages, direct or consequential, and expenses, all as defined by the term 'ultimate net loss' on account of . . . Property Damage . . . caused by or arising out of each occurrence."  *Id.* at Insuring Agreements § 1.

84.    The First-Layer Umbrella Settled Policies define "Ultimate Net Loss" as "the total sum which the Insured or any company as his insurer becomes obligated to pay by reason of . . . Property Damage . . . claims, either through adjudication or compromise, and all sums paid for expense . . . in respect to litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of employees and office expenses of the Insured or of any underlying insurer or any other expenses which are recoverable through any other valid and collectible insurance."  *Id.* at Definitions § 7.

85.    The First-Layer Umbrella Settled Policies define "Occurrence" as "an event or continuous or repeated exposure to conditions, which unexpectedly causes . . . Property Damage . . . during the policy period." *Id.* at Definitions § 6.

86.    The First-Layer Umbrella Settled Policies define "Property Damage" as "direct or consequential damage to or destruction of tangible property, including the loss of use thereof." *Id.* at Definitions § 3.

87.    Regardless of whether the event in question continues subsequent to a given policy period, the "Occurrence" definition further provides that "[a]ll such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence." *Id.* at Definitions § 6.

88.    The First-Layer Umbrella Settled Policies contain a "Prior Insurance and Non-Cumulation of Liability" provision stating that:

> It is agreed, that if any loss is also covered in whole or in part under any other excess policy issued to the insured prior to the inception date hereof, the Company's limit of liability as stated in Item 3 of the Declarations [$2 million] shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

*Id.* at Conditions § 3.

89.    The First-Layer Umbrella Settled Policies' Notice of Occurrence provision, as amended by the Policy's "New York Endorsement," provides:

> Notice of any accident or occurrence, which appears likely to involve this policy, shall be given by or for the Insured to the company or any of its authorized agents as soon as practicable, provided, however, that failure to notify the Company or any of its authorized agents of any occurrence which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims.

*Id.* at End. 11.

17

90.     The First-Layer Umbrella Settled Policies provide aggregate limits of liability for each year within the respective three-year policy periods wherever such limits are triggered "by reason of the reduction or exhaustion of the aggregate limits of liability under the [Primary Settled Policies]." *Id*. at § 2(c)(1).

91.     As further explained below, these First-Layer Umbrella Settled Policies, while fully exhausted, are central to this action because all of the Available Policies in IBM's possession and, upon information and belief, all other Available Polices "follow form" to their terms and conditions, meaning, unless otherwise noted, they adopt the same terms, conditions and exclusions of such First-Layer Umbrella Settled Policies.

92.     Notwithstanding IBM's settlement with Continental, IBM has incurred Remediation Expenses sufficient to exhaust available limits under all First-Layer Umbrella Settled Policies from the Relevant Timeframe.

   **iii. The Second Through Fourth-Layer Umbrella/Excess Settled Policies**

93.     During the Relevant Timeframe and excess of the First-Layer Umbrella Settled Policies, IBM purchased the following now Settled Policies at the second-excess through fourth-excess layers of coverage (the "Second-Fourth Excess Layer Settled Policies"), in ascending order:

  a. <u>Second-Excess Layer</u>—$8 million of umbrella coverage from American Home Assurance Company ("American Home") in excess of $2.1 million underlying limits[2];

---

[2] The American Home Settled Policies incepted on July 1, 1963 and ran through the end of the Relevant Timeframe. From December 31, 1960 through July 13, 1962, IBM purchased this $8 million layer of second-umbrella coverage from non-party Lloyd's of London (the policy is a Settled Policy by virtue of the settlement between IBM and Lloyd's). Then, from July 1, 1962 through June 30, 1963, IBM purchased this umbrella layer from Defendant Insurer Stuyvesant Insurance Company ("Stuyvesant"), which policy is an Available Policy.

b.    Third-Excess Layer—$2 million of excess coverage from Continental in excess of $10.1 million underlying limits; and

c.    Fourth-Excess Layer—$5 million of excess coverage from General Reinsurance Corporation ("General Re") in excess of $12.1 million in underlying limits.

94.    The second-umbrella layer Settled Policy issued by American Home for the policy period from July 1, 1968 through the end of the Relevant Timeframe follows form in all material respects to "the terms and conditions of [the underlying First-Excess Umbrella Settled Policy issued by Continental,] including all renewals and rewrites thereof."

95.    Upon information and belief, the second-umbrella layer Settled Policies issued by American Home for the policy periods from July 1, 1963 through July 1, 1968 (collectively with the policy incepting July 1, 1968, the "American Home Settled Policies") also "follow form" in all material respects to the terms and conditions of the applicable underlying First-Layer Umbrella Settled Policies.

96.    The second-umbrella layer American Home Settled Policies for the policy period from July 1, 1968 through the end of the Relevant Timeframe include the following endorsement setting an aggregate annual limit of liability:

It is also understood and agreed that the annual aggregate limit under the policy to which this endorsement is attached shall not exceed a combined total limit of liability of $8,000,000 during any annual period.

97.    Upon information and belief, the second-excess layer American Home Settled Policies for the policy periods from July 1, 1963 through July 1, 1968 also include the same endorsement setting an aggregate annual limit of liability.

98.    Based on that endorsement, the second-umbrella layer American Home Settled Policies each provide a maximum of $8 million of coverage per year, regardless of the number of claims or occurrences triggering coverage in that year.

19

99.    Upon information and belief, the policies on the third-excess layer issued by Continental during the Relevant Timeframe ("Continental Settled Policies") also follow form in all material respects to the underlying First-Layer Umbrella Settled Policies and/or the underlying American Home Settled Policies.

100.    The third-excess layer Continental Settled Policies include the following endorsement setting an aggregate annual limit of liability:

> It is also understood and agreed that the annual aggregate limit under the policy to which this endorsement is attached and policy RDX 9139456 shall not exceed a combined total limit of liability of $2,000,000 during any annual period, and the annual aggregate limit of liability under the policy to which this endorsement is attached shall be reduce[d] by any amounts payable under policy RDX 9139456.

101.    Based on that endorsement, the third-excess layer Continental Settled Policies provided a maximum of $2 million of coverage per year regardless of the number of claims or occurrences.

102.    The policies on the fourth-excess layer issued by General Re during the Relevant Timeframe ("General Re Settled Policies") are also "subject to the same terms, warranties, and conditions (except as respects the amount of premium, the amount of liability and except as may otherwise be provided herein) as are contained in or may be added to the underlying policies specified in [among other policies, the First-Layer Umbrella Settled Policies]."

103.    The fourth-excess layer General Re Settled Policies include a declarations page that reads in part as follows:

> Excess Umbrella Liability
> $5,000,000 Combined Single Limit
> Any One Occurrence

104.    Based on that language, upon information and belief, the fourth-excess layer General Re Settled Policies provide coverage on a per occurrence basis regardless of how many

occurrences led to claims thereunder in a given year, subject to a limit of $5 million per occurrence.[3]

105.    In summary, with the exception of the $8 million second-excess layer Stuyvesant Available Policy in force from July 1, 1962 through June 30, 1963—the primary through fourth-excess layer policies occupying the first $17.1 million in limits for each year during the Relevant Timeframe, upon information and belief, are Settled Policies.

106.    IBM has incurred Remediation Expenses that exceed the limits of all implicated Settled Policies.

**B.    Available Policies**

107.    The Available Policies under which IBM seeks coverage sit directly excess to the Settled Policies described in the preceding section.  For reference, the table below includes the first two Available Policies, reflected in green, in the Relevant Timeframe:

| Insurer | Policy Periods in Relevant Timeframe | Policy Layer | Limit | Status |
|---|---|---|---|---|
| Zurich | 12/31/60-12/31/70 | Primary | $100K P/O and Agg. | Settled |
| Continental Casualty | 11/01/61-11/05/70 | 1st Umbrella | $2M P/O and Agg. xs Primary | Settled |
| American Home | 07/01/63-07/01/70 | 2nd Umbrella | $8M P/O and Agg. xs $2.1M | Settled |
| Continental Casualty | 07/01/61-07/01/70 | 3rd Excess | $2M P/O and Agg. xs $10.1M | Settled |
| General Reinsurance | 06/29/61-07/01/70 | 4th Excess | $5M P/O xs $12.1M | Settled |

---

[3] General Re is a non-party with respect to the General Re Settled Policies but is a Defendant because, upon information and belief, based on IBM's review of publicly available documentation, it is the successor to North Star Reinsurance Corporation, which sold at least one Available Policy.

| Insurer | Policy Periods in Relevant Timeframe | Policy Layer | Limit | Status |
|---------|--------------------------------------|--------------|-------|--------|
| American Re-Insurance | 06/29/61-07/01/70 | 5th Excess | $3M P/O xs $17.1M | Available |
| Federal Insurance | 12/17/63-01/01/71 | 6th Excess | $5M part of $10M P/O xs $20.1M | Available |

108. There are numerous Available Policies excess of the Federal Insurance sixth-excess layer of coverage reflected above. Said coverage, to the extent presently known by IBM, is listed in Appendix A, which is incorporated herein by reference.

### i.    Fifth-Excess Layer American Re Available Policies

109. Directly excess of the General Re Settled Policies providing $5 million in limits, IBM purchased a policy with limits of $3 million from Defendant American Re-Insurance Company for each year during the Relevant Timeframe (the "American Re Available Policies"). Filed herewith as **Exhibit C** is an exemplar American Re Available Policy from the Relevant Timeframe, the terms of which are incorporated by reference herein.

110. The American Re Available Policies state that they are "to further indemnify the Insured against ultimate net loss arising out of the hazards covered and as defined in the underlying insurance but only up to [$3 million per occurrence]." Ex. C at Insuring Agreement.

111. Each American Re Available Policy states that "EXCEPT AS MAY BE inconsistent with [the other terms of the policy], the coverage provided by this Certificate shall follow the insuring agreements, conditions and exclusions of the Underlying Insurance, including any change by endorsements." *Id*. at Conditions.

112. The Declarations to the American Re Available Policies identify "Underlying Insurance" as the First-Layer Umbrella Settled Policies, second-umbrella American Home Settled

Policies, third-excess Continental Settled Policies, and fourth-excess General Re Settled Policies. In effect, therefore, the American Re Available Policies follow form to all substantive terms and conditions of the First-Layer Umbrella Settled Policies (which are the only Underlying Insurance that contain substantive terms and conditions). *Id*. at Declarations § 2.

113.    While the American Re Available Policies follow form to the hazards covered by the First-Layer Umbrella Settled Policies, they differ from such policies by, among other things, having their own definition of "Ultimate Net Loss." *Id*. at Loss Adjustment.

114.    The American Re Available Policies' definition of Ultimate Net Loss includes "the sums paid in settlement of losses for which the Insured is liable . . ." but  excludes "Costs." *Id*.

115.    "Costs" are defined to include "investigation, adjustment and legal expenses." *Id*.

116.    Separate from the definition of "Ultimate Net Loss," however, the American Re Available Policies cover Costs in certain circumstances.  Specifically, if Costs: (1) "exceed the Primary Limit or Limits;" (2) are incurred by IBM "with the written consent of [American Re];" and (3) pertain to settlements or litigation to which American Re consents, then American Re "shall contribute to the Costs incurred by the Insured in the ratio that its proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss." *Id*.

117.    The American Re Available Policies provide coverage "[u]p to an amount not exceeding $3,000,000 for any one occurrence." *Id*. at Declarations § 3.

**ii.    Sixth-Excess Layer Federal Available Policies**

118.    Upon information and belief, from the beginning of the Relevant Timeframe through December 16, 1963, the American Re Available Policies were the highest available excess policies within IBM's "tower" of coverage.

119.    From December 17, 1963 through the end of the Relevant Timeframe, directly excess of the fifth-excess layer American Re Available Policies, IBM purchased more coverage,

including $5 million sixth-excess layer policies from Defendant Federal Insurance Company ("Federal") (the "Federal Available Policies") and insolvent insurer Home Insurance Company ("Home") (the "Home Insolvent Policies").  The Federal Available Policies and Home Insolvent Policies each insured 50% of the same $10 million layer excess of $20.1 million in underlying limits.  Filed herewith as **Exhibit D** is an exemplar Federal Available Policy from the Relevant Timeframe, the terms of which are incorporated by reference herein.

120.    In the Federal Available Policies, Federal "agrees to indemnify the Insured against loss resulting from Umbrella Liability as defined and limited in [the applicable underlying First-Layer Umbrella Settled Policy]."  As such, the Federal Available Policies "follow form" to the First-Layer Umbrella Settled Policies' coverage for "all sums which the Insured shall be obligated to pay by reason of the liability, (a) imposed upon the Insured by law … caused by or arising out of each occurrence."

121.    The Federal Available Policies also follow form to the First-Layer Umbrella Settled Policies' definition of "Ultimate Net Loss," which includes an obligation to indemnify IBM for "all sums paid for expenses … in respect of litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder[.]"

### iii.    All Other Excess Available Policies

122.    From December 17, 1963 through the end of the Relevant Timeframe, IBM purchased additional excess coverage up to a maximum level of $150.1 million per year.

123.    Excess of the Federal Available Policy in each of those policy years, there are tens of millions of dollars of Available Policies under which IBM also seeks coverage in this action.

124.    The majority of the Available Policies sitting excess of the Federal Available Policies also follow form to the First-Layer Umbrella Settled Policies (or to other underlying policies that do so).  For the remaining Available Policies for which IBM continues to pursue full

policy documentation, upon information and belief, said policies follow form to the First-Layer Umbrella Settled Policies (or to other underlying policies that do so).  As such, these Available Policies afford IBM the same coverage afforded by the First-Layer Umbrella Settled Policies, subject only to each of their respective limits of liability and any other Available Policy-specific terms and conditions.

## III.    IBM'S NOTICE OF THE REMEDIATION CLAIMS, SETTLEMENT WITH NON-PARTY INSURERS, AND NOTICE OF THE ENDICOTT CLAIM

### A.    *Remediation Claims:  Initial Notice, Early Settlements, and Exhaustion of Settled Policies*

125.    Beginning in or around the late 1970s and early 1980s, IBM gave notice of each Remediation Claim to its CGL insurers promptly after the document commencing such Remediation Claim was received, including to non-party insurers and Defendant Insurers issuing coverage during the Relevant Timeframe.

126.    IBM's practice of giving timely notice of new Remediation Claims to its CGL insurers, including to non-party insurers and Defendant Insurers issuing coverage during the Relevant Timeframe, continued through subsequent decades and remains IBM's practice today.

127.    On or about April 26, 1993, IBM reached a confidential Settlement Agreement with Zurich and its affiliate American Guarantee and Liability Insurance Company (the "Zurich Settlement").

128.    On or about March 20, 2000, IBM reached a confidential Comprehensive Settlement Agreement and Release with Continental and affiliated entities (the "Continental Settlement").

129.    On or about June 21, 2000, IBM reached a confidential Settlement Agreement with American Home and affiliated entities (the "American Home Settlement").

130.    Upon information and belief, based on IBM's review of historical records, in or around August 2000, IBM reached a confidential Settlement and Release Agreement with General Re (the "General Re Settlement").

131.    On or about June 13, 2007, IBM reached a confidential Settlement Agreement and Release with Lloyd's (the "Lloyd's Settlement" and, collectively with the Zurich Settlement, the Continental Settlement, the American Home Settlement, and the General Re Settlement, the "Prior Settlements").

132.    Under the Prior Settlements, IBM has released said insurers from past, present, and future Remediation Claims under all Settled Policies from the Relevant Timeframe.

133.    Since the time of the Prior Settlements, IBM has conducted annual calls or meetings with its historical CGL insurers, to which all Defendant Insurers have been invited, providing updates on previously noticed Remediation Claims against IBM and Remediation Expenses being incurred in response thereto ("Annual Notice Calls").

134.    On each Annual Notice Call, personnel from IBM and its insurance broker deliver detailed information about Environmental Sites, generally focusing on the sites at which IBM has been forced to incur the greatest amount of Remediation Expenses.

135.    The Annual Notice Calls, which have occurred as recently as 2023, are intended to keep IBM's historical CGL insurers apprised of the current status at IBM Environmental Sites and preserve IBM's rights to pursue coverage for the Remediation Claims in the future.

136.    Upon information and belief, based on IBM's review of historical records, all Defendant Insurers have been invited to the Annual Notice Calls for multiple decades, and many have in fact attended numerous Annual Notice Calls over the years.

137.    IBM has not settled, compromised, released, discharged, withdrawn, or in any other respect concluded its claims for insurance coverage for the Remediation Claims against any Defendant Insurer under the Available Policies.

138.    IBM has incurred covered Remediation Expenses that far exceed the applicable limits of liability for all Settled Policies during the Relevant Timeframe.

**B.    *Notice of Endicott Claim and Coverage Demands to American Re and Federal***

139.    In 2024, IBM gave timely notice of the Endicott Claim to its CGL insurers under various policies, including to Defendant Insurers under the 61-70 Policies, in connection with the October 26, 2023 letter from counsel for the Village of Endicott.

140.    In or around mid-December 2024, after the Village of Endicott filed suit on December 3, 2024, IBM gave supplemental notice to all Defendant Insurers, enclosing the Complaint and providing information about the status of the Endicott Claim and defense counsel.

141.    On January 10, 2025, American Re issued a notice acknowledgement in which it reserved its rights to deny coverage for the Endicott Claim on various grounds, including alleged late notice and alleged uncertainty as to the existence, number and/or dates of an occurrence, and existence of American Re's 61-70 Policies.

142.    On January 16, 2025, IBM sent a letter to American Re informing it (as well as all other Defendant Insurers, who were copied) that numerous Remediation Claims have exhausted applicable underlying limits and demanding coverage for Remediation Expenses in excess of the General Re Settled Policies.

143.    IBM further demanded that American Re acknowledge its obligation to provide coverage for the Endicott Claim under the American Re Available Policies.

144.    IBM's January 16, 2025 letter to American Re requested a response by February 5, 2025, but American Re did not respond.

145.    After IBM again sought American Re's acknowledgement of its coverage obligations to IBM on February 10, 2025, American Re responded on February 17, 2025, contending that it lacked sufficient information to provide a more substantive coverage position, including the American Re Available Policies themselves.

146.    American Re's February 17, 2025 response also reserved rights based on, among other things, IBM's alleged failure to demonstrate underlying exhaustion.

147.    Shortly thereafter, on February 19, 2025, IBM provided American Re with the American Re Available Policies under which IBM seeks coverage here, as well as the underlying Continental First-Layer Umbrella Settled Policies to which the American Re Available Policies follow form and which contain "non-cumulation" provisions.

148.    After American Re declined to acknowledge its coverage obligation for the Endicott Claim, IBM wrote to Federal on February 19, 2025 demanding defense costs coverage based on Federal's present obligation to reimburse defense costs under the Federal Available Policies for the Endicott Claim, and noting that all underlying policies have been exhausted through other Environmental Claims.

149.    As of the filing of this action, two months after IBM's demand to Federal, Federal has not responded to acknowledge its coverage obligations.

150.    On April 11, 2025, following IBM's coverage demand and after having conducted a virtual meeting with American Re on March 6, 2025, IBM sent a letter to American Re providing it (as well as all other Defendant Insurers, who were copied) with various additional information relating to the Environmental Claims.

151.    IBM's April 11, 2025 letter provided all Defendant Insurers with copies of the First-Layer Umbrella Settled Policies to which, upon information and belief, all Defendant Insurers follow form (copies of which IBM had provided to American Re on February 19, 2025).

152.    As of the filing of this action, however, no Defendant has acknowledged IBM's entitlement to coverage for the Environmental Claims under the Available Policies.

**FIRST CAUSE OF ACTION**
**Declaratory Judgment – Duty to Indemnify for Endicott Environmental Claims**
**(All Defendants)**

153.    Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

154.    The Available Policies issued to IBM each constitute a valid, enforceable contract between each Defendant and IBM, and IBM seeks coverage under those insurance policies.

155.    The Available Policies obligate Defendants to indemnify IBM for all sums which IBM shall become legally obligated to pay as damages, including settlements and judgments, because of property damage caused by an occurrence.

156.    For example, Defendant American Re is the Defendant whose 61-70 Policies sit directly excess to the General Re Settled Policies.  The American Re Available Policies state that they are "to further indemnify the Insured against ultimate net loss arising out of the hazards covered and as defined in the underlying insurance but only up to [$3 million per Occurrence]."

157.    The American Re Available Policies all follow form to "the insuring agreements, conditions and exclusions of the Underlying Insurance . . ." except "as may be inconsistent with" the specific terms and conditions of the American Re Available Policies.

158.    As used in the American Re Available Policies, the term "Underlying Insurance" refers to the First-Layer Umbrella Settled Policies and Second-Fourth Excess Layer Settled Policies.

159.    Among those policies listed as Underlying Insurance, only the First-Layer Umbrella Settled Policies include substantive terms and conditions; therefore, American Re's coverage obligations are as set forth in the First-Layer Umbrella Policies (the "Followed Policies"), to the extent the terms therein are not "inconsistent with" the American Re Available Policies.  *See* Ex. C.

160.    The Followed Policies provide that they will "indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability, (a) imposed upon the Insured by law … caused by or arising out of each occurrence," and such indemnification will be measured according to the Followed Policies' definition of "Ultimate Net Loss."

161.    Because the American Re Available Policies follow the Followed Policies except where inconsistent with terms in the American Re Available Policies, American Re must "indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability, (a) imposed upon the Insured by law . . . caused by or arising out of each occurrence."

162.    All other Available Policies within IBM's possession provide materially similar insuring agreements to the American Re Available Policies.

163.    IBM provided timely notice to Defendants of each of the Endicott Environmental Claims under the Available Policies, and otherwise performed any obligations required of it under the Available Policies.

164.    The Endicott Environmental Claims allege "Occurrences" covered by the Followed Policies, as such term is defined in the Followed Policies and referenced in the definition of Ultimate Net Loss set forth above.

165.    The Endicott Environmental Claims are covered under the Available Policies, and coverage is not otherwise excluded by any terms or conditions of the Available Policies.

166.    The Village's alleged damages in the Endicott Claim and IBM's Remediation Expenses in the Endicott Plant Remediation Claim are each sufficient to trigger the Available Policies, including all Available Policies in any of the periods within the Relevant Timeframe.

167.    Defendants contest and/or have not acknowledged their legal obligations to pay any damages, as set forth in the Followed Policies or other relevant Available Policies, incurred by IBM in connection with any of the Endicott Environmental Claims.  For instance, no Defendant has responded to acknowledge IBM's entitlement to coverage for IBM's prior Remediation Expenses or acknowledge IBM's entitlement to coverage for any damages in the Endicott Claim, notwithstanding IBM's voluminous support provided with its coverage demand.

168.    Thus, an actionable and justiciable controversy exists between IBM and Defendants concerning the proper construction and application of the Available Policies, and the rights and obligations of the parties thereto, with respect to the Endicott Environmental Claims.  All facts necessary for an adjudication of this controversy have occurred.

169.    IBM therefore seeks a judicial declaration from this Court (1) confirming that the Available Policies: (a) provide coverage for the Endicott Environmental Claims; (b) obligate each Defendant Insurer to indemnify IBM for any damages that may arise from the Endicott Claim and the Remediation Expenses IBM has incurred and continues to reasonably incur in the Endicott Plant Remediation Claim and Endicott Landfill Remediation Claim, subject only to each Available

Policy's attachment requirements and limits of liability; and (2) confirming the existence, number and/or dates of the occurrences at issue in the Endicott Environmental Claims.

170.    A judicial declaration is necessary at this time so that the parties' controversies may be resolved and they may be aware of their respective rights and duties under the Available Policies. The issuance of prompt declaratory relief by this Court will terminate the existing controversy between the parties.

171.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of IBM and against Insurers, declaring that Insurers are obligated to indemnify IBM for any damages, including Remediation Expenses, incurred by IBM in connection with the Endicott Environmental Claims, subject only to each Available Policy's attachment requirements and limits of liability.

**SECOND CAUSE OF ACTION**
**Declaratory Judgment – Duty to Reimburse Defense Costs for Endicott Claim**
**(All Defendants)**

172.    Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

173.    The Available Policies issued to IBM each constitute valid, enforceable contracts between each Defendant and IBM, and IBM seeks coverage under those insurance policies.

174.    The Available Policies obligate Defendants to indemnify IBM for all sums reasonably incurred in its defense of proceedings alleging property damage caused by an occurrence, such as the Endicott Claim.

175.    For example, Defendant Federal, the first Defendant whose policies follow the Followed Policies' definition of Ultimate Net Loss, issued the Federal Available Policies stating that Federal "agrees to indemnify the Insured against loss resulting from Umbrella Liability as

defined and limited in [the applicable underlying first-layer Continental Settled Policy]." Accordingly, the Federal Available Policies follow form to the Followed Policies.

176.    The Followed Policies provide that they will "indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability, (a) imposed upon the Insured by law … caused by or arising out of each occurrence," such indemnification to be measured according to the Followed Policies' definition of Ultimate Net Loss:

> The term 'Ultimate Net Loss' shall mean the total sum which the Insured or any company as his insurer becomes obligated to pay by reason of … Property Damage … claims, either through adjudication or compromise, and all sums paid for expense, including premiums for attachment or appeal bonds, in respect of litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of employees and office expenses of the Insured or of any underlying insurer or any other expenses which are recoverable through any other valid and collectible insurance.

177.    The Endicott Claim alleges an "Occurrence" covered by the Followed Policies, as such term is defined in the Followed Policies and referenced in the definition of Ultimate Net Loss set forth above.

178.    Based on the definition of Ultimate Net Loss in the Followed Policies and the fact that IBM has incurred Remediation Expenses sufficient to exceed all underlying limits of liability, Federal is presently obligated to indemnify IBM for all defense costs IBM reasonably has incurred or will in the future incur in the Endicott Claim under any of the Federal Available Policies.

179.    Upon information and belief, many other Available Policies provide materially similar defense costs coverage to the Federal Available Policies and therefore will be obligated to indemnify IBM for all defense costs IBM reasonably has incurred or will in the future incur in the Endicott Claim if and when IBM's defense costs exceed the underlying Available Policies' limits.

180.    IBM provided notice to Defendants of the Endicott Claim, and otherwise performed any obligations required of it under the Available Policies.

181.    Coverage for the Endicott Claim is not otherwise excluded by any terms or conditions of the Available Policies.

182.    Neither Federal nor any other Defendant that issued Available Policies has acknowledged its obligation to indemnify IBM for its defense costs incurred in connection with the Endicott Claim or indemnified IBM for defense costs already incurred in connection therewith. Thus, an actionable and justiciable controversy exists between IBM and Defendants concerning the proper construction and application of the Available Policies, and the rights and obligations of the parties thereto, with respect to the Endicott Claim.  All facts necessary for an adjudication of this controversy have occurred.

183.    IBM therefore seeks a judicial declaration from this Court confirming that the Available Policies: (1) provide coverage for at least one of the claims made in the Endicott Claim; and (2) obligate Defendants to indemnify IBM for all defense costs IBM reasonably has incurred or will incur in the future in the Endicott Claim, subject only to each Available Policy's attachment requirements and limits of liability.

184.    A judicial declaration is necessary at this time so that the parties' disputes may be resolved and they may be aware of their respective rights and duties under the Available Policies. The issuance of prompt declaratory relief by this Court will terminate the existing controversy between the parties.

185.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of IBM and against Insurers, declaring that Insurers are obligated to indemnify IBM for any defense costs incurred by IBM in connection with its defense against the Endicott Claim, subject only to each Available Policy's attachment requirements and limits of liability.

### THIRD CAUSE OF ACTION
**Declaratory Judgment – Duty to Indemnify for All Other Remediation Claims**
**(All Defendants)**

186.    Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

187.    The Available Policies issued to IBM each constitute valid, enforceable contracts between each Defendant and IBM, and IBM seeks coverage under those insurance policies.

188.    The Available Policies obligate Defendants to indemnify IBM for all sums which IBM shall become legally obligated to pay as damages, including settlements and judgments, because of property damage caused by an occurrence.

189.    IBM provided notice to Defendants of the Remediation Claims under the Available Policies, and otherwise performed any obligations required of it under the Available Policies.

190.    The Remediation Claims allege "Occurrences" covered by the Followed Policies, as such term is defined in the Followed Policies and referenced in the definition of Ultimate Net Loss set forth above.

191.    The Remediation Claims are covered under the Available Policies based on the same coverage provisions set forth above, among others, and coverage is not otherwise excluded by any terms or conditions of the Available Policies.

192.    IBM's Remediation Expenses in the Remediation Claims are sufficient to trigger the Available Policies, including Available Policies in any of the periods within the Relevant Timeframe.

193.    Defendants contest and/or have not acknowledged their legal obligations to pay IBM's covered losses for the Remediation Claims.  Thus, an actionable and justiciable controversy exists between IBM and Defendants concerning the proper construction and application of the

Available Policies, and the rights and obligations of the parties thereto, with respect to the Remediation Claims.  All facts necessary for an adjudication of this dispute have occurred.

194.    IBM therefore seeks a judicial declaration from this Court confirming that the Available Policies: (1) provide coverage for the Remediation Claims; and (2) obligate each Defendant Insurer to indemnify IBM for losses it has incurred and continues to reasonably incur in the Remediation Claims, subject only to each Available Policy's attachment requirements and limits of liability.

195.    A judicial declaration is necessary at this time so that the parties' controversy may be resolved and they may be aware of their respective rights and duties under the Available Policies.  The issuance of prompt declaratory relief by this Court will terminate the existing controversy between the parties.

196.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of IBM and against Insurers, declaring that Insurers are obligated to indemnify IBM for any damages incurred by IBM in connection with the Remediation Claims, subject only to each Available Policy's attachment requirements and limits of liability.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

(a)    On the First Cause of Action, Plaintiff requests that the Court enter a judgment against Defendant Insurers (i) declaring Defendant Insurers' respective obligations to indemnify Plaintiff under Available Policies against all losses Plaintiff has incurred and is reasonably expected to incur in the future in the Endicott Environmental Claims, subject only to each Available Policy's attachment requirements and limits of liability; and (ii) declaring the existence, number and/or dates of the occurrences at issue in the Endicott Environmental Claims;

(b)    On the Second Cause of Action, Plaintiff requests that the Court enter a judgment against Defendant Insurers declaring Defendant Insurers' respective obligations to indemnify IBM for all defense costs Plaintiff has reasonably incurred and will reasonably continue to incur in the future in its defense of the Endicott Claim, subject only to each Available Policy's attachment requirements and limits of liability;

(c)    On the Third Cause of Action, Plaintiff requests that the Court enter a judgment against Defendant Insurers declaring Defendant Insurers' respective obligations to indemnify Plaintiff under Available Policies against all losses Plaintiff has incurred and will reasonably continue to incur in the future in all other Remediation Claims, subject only to each Available Policy's attachment requirements and limits of liability;

(d)    On all Causes of Action, Plaintiff requests pre- and post-judgment interest to the extent permitted by law; and

(e)    On all Causes of Action, Plaintiff requests any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 15, 2025
      New York, New York

**COHEN ZIFFER FRENCHMAN & MCKENNA, LLP**

Robin L. Cohen
Kenneth H. Frenchman
Jillian M. Raines
Nicholas R. Maxwell
1325 Avenue of the Americas, 31st Fl.
New York, NY 10019
Telephone: (212) 584-1890
Fax: (212) 584-1891
rcohen@cohenziffer.com
kfrenchman@cohenziffer.com
jraines@cohenziffer.com
nmaxwell@cohenziffer.com

*Attorneys for International Business Machines Corporation*

## Appendix A

| | |
|---|---|
| | **Settled** |
| | **Insolvent/Liquidation** |
| | **Available** |

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| Aetna Casualty & Surety Company | 05/22/64-05/21/67 | 1xx8xx | 10th-$10M xs $52.5M |
| Aetna Casualty & Surety Company | 05/21/67-05/21/70 | IXN39SC | 2nd-$5M xs $2M |
| Aetna Casualty & Surety Company | 05/21/67-05/21/70 | 1XN37SC | 2nd-$10M xs $2M |
| Aetna Insurance Company | 05/21/69-05/21/70 | EX000404 | 15th-$2M xs $75.5M |
| Aetna Casualty & Surety Company | 05/21/67-05/21/70 | TBD | 24th-$5M xs $125M |
| Aetna Casualty & Surety Company | 05/21/67-05/21/70 | TBD | 26th-$5M xs $135M |
| American Home Assurance Company | 07/01/63-07/01/68 | CE 350011 | 2nd-$8M xs $2M |
| American Home Assurance Company | 07/01/65-07/01/68 | CE 350011 | 2nd-$8M xs $2M |
| American Home Assurance Company | 07/01/68-07/01/71 | CE 355452 | 2nd-$8M xs $2M |
| American Re-Insurance Company | 06/29/61-07/01/64 | M7117-0001 | 5th-$3M xs $17M |

---

[4] In certain instances, multi-year policies extend past the end of the Relevant Timeframe. Said policies are considered 61-70 Policies herein to whatever extent they were in effect during the Relevant Timeframe.

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| American Re-Insurance Company | 07/01/64-07/01/73 | M 71170002 | 5th-$3M xs $17M |
| Continental Casualty Company | 11/01/61-11/01/64 | RDU9972884 | 1st-$2M xs primary |
| Continental Casualty Company | 07/01/61-07/01/64 | RDX 9562798 | 3rd-$2M xs $10M |
| Continental Casualty Company | 11/01/64-11/01/67 | RDU9433466 | 1st-$2M xs primary |
| Continental Casualty Company | 07/01/64-07/01-67 | RDX9893615 | 3rd-$2M xs $10M |
| Continental Casualty Company | 11/01/67-11/05/70 | RDU9433884 | 1st-$2M xs primary |
| Continental Casualty Company | 07/01/67-07/01/70 | RDX9139453 | 3rd-$2M xs $10M |
| Employers' Liability Assurance Corporation, Limited | 05/22/64-05/21/67 | TBD | 9th-$3M PO $7.5M xs $45M |
| Employers' Liability Assurance Corporation, Limited | 05/21/67-05/21/70 | E168154003 | 9th-$3M PO $7.5M xs $45M |
| Employers' Liability Assurance Corporation, Limited | 05/21/67-05/21/70 | E168154005 | 12th-$1M xs $67.5M |
| Employers' Liability Assurance Corporation, Limited | 05/21/69-05/21/70 | E168154009 | 16th-$2.7M xs $77.5M |
| Employers' Liability Assurance Corporation, Limited | 05/21/69-05/21/70 | E168154011 | $2.5M xs $122.5M |
| Employers Liability Assurance Corporation, Limited | 05/21/69-05/21/70 | E168154007 | $3M xs $140M |
| Employers Mutual Liability Insurance Company of Wisconsin | 05/22/64-05/21/67 | 53700065161 | 11th-$5M xs $62.5M |

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| Employers Mutual Liability Insurance Company of Wisconsin | 05/22/67-05/21/70 | 053000065161 | 11th-$5M xs $62.5M |
| Federal Insurance Company | 12/17/63-01/01/67 | 77014980 | 6th-$5M PO $10M xs $20M |
| Federal Insurance Company | 01/01/67-01/01/73 | 77423385 | 6th-$5M PO $10M xs $20M |
| Fidelity and Casualty Company of New York | 05/21/64-05/21/67 | LX 1634 | 9th-$1.0M PO $7.5M xs $45M |
| Fidelity and Casualty Company of New York | 01/26/65-05/21/67 | LX 1648 | 26th-$5M xs $145M |
| Fidelity and Casualty Company of New York | 05/21/67-05/21/70 | LX6330222 | 9th-$1M PO $7.5M xs $45M |
| Fidelity and Casualty Company of New York | 05/21/67-05/21/70 | LX 6330223 | 26th-$5M xs $145M |
| Fireman's Fund Insurance Company | 05/22/64-05/21/67 | XL75249 | 9th-$2.5M PO $7.5M xs $45M |
| Fireman's Fund Insurance Company | 05/21/67-05/21/70 | TBD | 9th-$2.5M PO $7.5M xs $45M |
| Fireman's Fund Insurance Company | 01/01/67-05/21/73 | XL95789 | 18th-$2.5M xs $87.2M |
| General Reinsurance Corporation | 06/29/61-07/01/64 | X3100 | 4th-$5M xs $12M |
| General Reinsurance Corporation | 07/01/64-07/01/67 | X3595 | 4th-$5M xs $12M |
| General Reinsurance Corporation | 07/01/67-07/01/70 | X4105 | 4th-$5M xs $12M |
| Globe Indemnity Company | 05/26/64-05/21/67 | GLX100013 | 17th-$5M xs $80.2M |

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| Globe Indemnity Company | 05/26/67-05/21/70 | GLX 120033 | 16th-$5M xs $80.2M |
| Great American Insurance Company | 05/22/64-05/21/67 | XO 4332603 | 12th-$1M xs $67.5M |
| Home Insurance Company | 12/17/63-01/01/67 | HEC9543550 | 6th-$5M PO $10M xs $20M |
| Home Insurance Company | 01/01/67-01/01/73 | HEC9557657 | 6th-$5M PO $10M xs $20M |
| Home Insurance Company | 05/21/67-05/21/70 | HEC9557818 | 19th-$1M xs $89.7M |
| Insurance Company of North America | 06/02/64-05/21/67 | TBD | 8th-$5M xs $40M |
| Insurance Company of North America | 06/02/64-05/21/67 | XBC1536 | 24th-$5M xs $130M |
| Insurance Company of North America | 05/21/67-05/21/70 | TBD | 8th-$5M xs $40M |
| Insurance Company of North America | 05/21/67-05/21/70 | XBC41202 | 23rd-$5M xs $130M |
| Interstate Reinsurance Corporation | 05/25/64-05/21/67 | 911001350 | 15th-$700K xs $75.5M |
| Liberty Mutual Insurance Company | 05/26/64-05/21/67 | RK130000750401 4TD92 | 18th-$2M xs $85.2M |
| Liberty Mutual Insurance Company | 05/21/67-05/26/70 | RK130000750401 7TD92 | 17th-$2M xs $85.2M |
| Liberty Mutual Insurance Company | 05/21/69-05/21/70 | RK130000750402 9TD92 | 25th-$2M xs $143M |
| Lloyd's and London Market Insurers | 07/14/59-07/13/62 | 75981; 75982; 75984;75986; 75987; 75988 | 2nd-$8M xs $2M |

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| Lloyd's and London Market Insurers | 06/02/64-05/21/67 | U96051/200787 | 23rd-$37.3M xs $92.7M |
| Lloyd's and London Market Insurers | 05/21/67-05/21/70 | U20738/207304 (1st yr) | 21st-$32.3M xs $92.7M |
| Michigan Mutual Liability Insurance Company | 06/24/64-05/21/67 | 291946 | 22nd-$2M xs $90.7M |
| Mission Insurance Company | 06/02/64-05/21/67 | MNY10230 | 19th-$500K xs $87.2M |
| North River Insurance Company | 05/22/64-05/21/67 | TBD | 14th-$2M xs $73.5M |
| North Star Reinsurance Corporation | 05/22/64-05/21/67 | TBD | 16th-$4M xs $76.2M |
| North Star Reinsurance Corporation | 05/21/67-05/21/70 | XSX6194 | 15th-$4.7M xs $75.5M |
| Peerless Insurance Company | 06/03/64-05/21/67 | 1-976 | 20th-$2M xs $87.7M |
| St. Paul Fire and Marine Insurance Company | 05/21/64-05/21/67 | 566XA3975 | 9th-$1M PO $7.5M xs $45M |
| St. Paul Fire and Marine Insurance Company | 05/21/67-05/21/70 | 565XA0492 | 9th-$1M PO $7.5M xs $45M |
| Stuyvesant Insurance Company | 07/01/62-06/30-63 | 6205218DE | 2nd-$8M xs $2M |
| Travelers Indemnity Company | 12/17/63-01/01/67 | EX1750644 | 7th-$10M xs $30M |
| Travelers Indemnity Company | 05/22/64-05/21/67 | EX1164174 | 13th-$5M xs $68.5M |
| Travelers Indemnity Company | 01/01/67-01/01/73 | EX2682400 | 7th-$10M xs $30M |

| Carrier | Policy Period[4] | Policy # | Policy Layer/Limit |
|---|---|---|---|
| Travelers Indemnity Company | 05/21/67-05/21/70 | EX3006262 | 13th-$5M xs $68.5M |
| Travelers Indemnity Company | 06/14/67-05/21/70 | EX3006263 | 25th-$5M xs $140M |
| United States Fire Insurance Company | 05/21/67-05/21/70 | XS2062 | 14th-$2M xs $73.5M |
| United States Fire Insurance Company | 05/21/67-05/21/70 | XS2063 | 20th-$2M xs $90.7M |
| Zurich Insurance Company | 12/31/60-12/31/61 | TBD | Primary-$100K |
| Zurich Insurance Company | 12/31/61-12/31/62 | TBD | Primary-$100K |
| Zurich Insurance Company | 12/31/62-12/31/63 | 8359700 | Primary-$100K |
| Zurich Insurance Company | 12/31/63-12/31/64 | 8448300 | Primary-$100K |
| Zurich Insurance Company | 12/31/64-12/31/65 | 8506100 | Primary-$100K |
| Zurich Insurance Company | 12/31/65-12/31/66 | 8506175 | Primary-$100K |
| Zurich Insurance Company | 12/31/66-12/31/67 | 8550600 | Primary-$100K |
| Zurich Insurance Company | 12/31/67-12/31/68 | 8570500 | Primary-$100K |
| Zurich Insurance Company | 12/31/68-12/31/69 | 8596100 | Primary-$100K |
| Zurich Insurance Company | 12/31/69-12/31/70 | 8636900 | Primary-$100K |